UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/14/2020
```

-------------------------------------------------------------X

MONIQUE MICHELLE MUNNINGS-BAH,      :

                                    :        19 Civ. 3510 (LJL) (RWL)

                    Plaintiff,      :

                                    :        **REPORT AND RECOMMENDATION**
          - against -               :        **TO HON. LEWIS J. LIMAN:**
                                    :        <u>**SOCIAL SECURITY APPEAL**</u>
ANDREW SAUL,                        :
COMMISSIONER OF SOCIAL SECURITY,    :

                                    :

                    Defendant.      :

-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge**

Plaintiff Monique Michelle Munnings-Bah ("Munnings-Bah" or "Plaintiff"), represented by counsel, commenced the instant action against Defendant Andrew Saul, the Commissioner of the Social Security (the "Commissioner"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Munnings-Bah is not entitled to disability insurance benefits ("DIB") under 42 U.S.C. § 423 *et seq.* The parties have submitted cross-motions pursuant to Rule 12(c) of the Federal Rules of Civil Procedure seeking judgment on the pleadings. For the reasons stated below, the Commissioner's motion should be DENIED, Munnings-Bah's motion should be GRANTED, and this case should be REMANDED.

**Background**

**A.      Procedural History**

On November 10, 2015, Munnings-Bah filed an application for DIB alleging that she has been disabled since February 11, 2015, because of "panic attacks and agoraphobia, bulging discs and hypertension." (Administrative Record, Dkt. 13-1 to 13-23 ("R."), 99, 114.) On January 7, 2016, the Social Security Administration (the

"Administration") denied Munnings-Bah's application, having determined that the medical evidence "did not show any conditions of a nature that would prevent [her] from working." (R. 114.)  Munnings-Bah then filed a written request for a hearing before an Administrative Law Judge ("ALJ").  (R. 122-23.)  A hearing before ALJ Miriam L. Shire was held on December 27, 2017, at which Munnings-Bah appeared and testified with the assistance of counsel.  (R. 34-97.)  On April 3, 2018, the ALJ issued a decision finding that Munnings-Bah was not disabled under 42 U.S.C. §§ 416(i), 423(d).  (R. 10-25.)  Munnings-Bah timely sought review of the ALJ's decision.  (R. 172-73.)  On February 20, 2019, the Appeals Council denied review, making the ALJ's decision the final determination of the Commissioner.  (R. 1-3.)

Represented by counsel, Munnings-Bah filed her Complaint in this action on April 19, 2019, seeking district court review pursuant to 42 U.S.C. § 405(g).  (Dkt. 1.)  On April 25, 2019, the Honorable Paul A. Engelmayer, U.S.D.J., referred this matter to the undersigned for a Report and Recommendation.  (Dkt. 7.)  On February 4, 2020, the case was reassigned to the Honorable Lewis J. Liman, U.S.D.J.

## B.     Relevant Medical History and Medical Opinions

Pursuant to the Court's supplemental standing order dated April 25, 2019, each party was instructed to direct the Court to any perceived inaccuracies in the other's summary of the record by including "a footnote or section that lists each such statement, explains why each such statement is inaccurate, and includes supporting cites to the record." (Dkt. 9.)  Neither party has expressed material disagreement with the facts as stated by the other party; rather, each party emphasizes different facts.  Accordingly the Court adopts both versions of the facts in their entirety.   The Court also has

independently reviewed the 3,300-page record, but will discuss the record only as necessary to address specific issues raised by the parties. The following discussion separately addresses evidence of physical impairments and evidence of mental impairments.

### 1. Evidence of Physical Impairments

Munnings-Bah has sought treatment at Walton Family Health Center ("Walton") since at least September 2015, mostly for low back pain, sciatica, and right shoulder pain. Office treatment records show that Munnings-Bah visited Walton about five times between September 2015 and December 2015, and about five times from May 2016 to August 2016. During those periods, she was seen by Dr. Alexandra Aarons once, Dr. Akash Patel once, Dr. Sarah Miller once, Dr. Tony Davis three times, and Dr. Rupa Natarajan four times. From January 2016 to July 2016, Munnings-Bah also underwent physical therapy for lumbar disc herniation at Morris Heights Health Center ("Morris Heights"), where her treatment was supervised by physical therapist Gwonuk Lim ("PT Lim"). Munnings-Bah returned to PT Lim for right shoulder physical therapy from October 2016 to January 2017. Between March 2015 and September 2015, Munnings-Bah further took yoga classes at Walton (led by Emily Hackenberg, ANP) to lose weight, improve strength and mobility, and manage stress and anxiety.[1]

---

[1] The record does not contain progress notes from Walton covering yoga classes beyond September 2015. At a June 23, 2016 visit to her treating psychiatrist Dr. Pik Sai Yung, Munnings-Bah reported that she "has started . . . doing yoga." (R. 3290.) And, at an August 5, 2016 visit to family practitioner Dr. Sarah Miller, Munnings-Bah again reported "[d]oing yoga." (R. 3292.)

### a.    Opinion of Consultative Examiner Sharon Revan, M.D.

On December 29, 2015, Dr. Sharon Revan, a consultative physician, examined Munnings-Bah.  Remarking on her general appearance, gait, and station, Dr. Revan observed that Munnings-Bah limped on her right side, was unable to walk on heels and toes, and could squat only one-quarter of the way due to back pain.  Still, she appeared to be in no acute distress.  Her stance was normal; she had a cane that helped; she needed no assistance changing for her exam or getting on or off the exam table; and she rose from her chair without difficulty.  With respect to Munnings-Bah's musculoskeletal system, the range of motion of her cervical and lumbar spine was limited.  An X-ray of her lumbar spine showed straightening.  But her straight-leg raise test (to diagnose sciatica) was negative bilaterally.  She also had full bilateral range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles.  And her joints were stable and without abnormalities.  She had no sensation in her lower right leg and dullness in her hip.  But her upper and lower extremity strength was 5/5.  While her left-hand grip strength had diminished to 2/5, she retained 5/5 strength in her right hand, and her hand and finger dexterity was grossly intact.  (R. 2628-31.)

Dr. Revan diagnosed Munnings-Bah with sciatica, low back pain, and hypertension (as well as anxiety disorder, panic disorder, agoraphobia, and depression).  She rated Munnings-Bah's prognosis as "Fair."  Dr. Revan opined that Munnings-Bah had mild-to-moderate limitations on fine and gross motor activity due to left wrist pain; mild-to-moderate limitations on walking, standing, laying down, and climbing stairs due to back pain; and moderate limitations on personal grooming and activities of daily living secondary to wrist and back pain.  (R. 2631.)

### b.    Opinion of Treating Physician Rupa Natarajan, M.D.

In a medical source statement dated August 26, 2016, Dr. Natarajan diagnosed Munnings-Bah with lumbar disc herniation, left wrist pain, and right rotator cuff impingement.   Sitting, standing, bending, or lifting worsened her back pain; grasping items with her left hand worsened her left wrist pain; and lifting her arm or flexing it to the side worsened her right shoulder pain.   "[F]or all 3 joints," she had a reduced range of motion and joint instability, as well as "sharp pain" that was "constant[ ]" and "severe." She also had reduced grip strength and abnormal gait and posture.   Her Tramadol was giving her stomachaches.[2]   (R. 3148-49.)

Dr. Natarajan opined that in an eight-hour workday, Munnings-Bah can sit for four hours at most, and stand or walk for three hours at most.   And, after sitting for one hour, she must walk for at least one hour before sitting again.   Further, after standing or walking for one hour, she has to sit or lie down for half an hour.   Generally, she must lie down for at least one hour during each workday.   She can only occasionally lift one-to-five pounds and never more than that.[3]   Munnings-Bah can only occasionally maintain balance and never stoop.   She can frequently look sideways but only occasionally look up or down.[4]   She can only occasionally reach with her hands and arms, and handle with her left hand, but her ability to use the fingers of that hand is not limited.   She needs a cane both for standing and for walking on all surfaces and terrains.   As a result

---

[2] Tramadol is an opioid used to relieve moderate to moderately severe pain.  *Tramadol*, MEDLINEPLUS, https://medlineplus.gov/druginfo/meds/a695011.html (last updated Sept. 3, 2020).

[3] Occasionally means for up to one-third of an eight-hour workday.  (R. 3152.)

[4] Frequently means for one-third to two-thirds of an eight-hour workday.  (R. 3152.)

of her impairments, she is likely to be absent from work more than three times per month.   According to Dr. Natarajan, Munnings-Bah's condition has persisted since 2008.  (R. 3149-54.)

### 2.   Evidence of Mental Impairments

Since at least February 2014, Munnings-Bah sought mental health treatment at Walton, mainly for panic disorder with agoraphobia.  Office treatment records show that between February 2014 and July 2016, she visited treating psychiatrist Pik Sai Yung, MD, approximately 21 times for medication management, and mental health clinician Morgan Schulman, LCSW, about 31 times for psychotherapy.[5]   A medical source statement indicates that Munnings-Bah also saw another psychiatrist, Elishka Caneva, and nurse practitioner, Claudia Melendez, monthly since December 2016 for psychopharmacology.  (R. 3141.)

### a.   Opinion of State Agency Reviewer T. Inman-Dundon, Ph.D.

On January 7, 2016, Dr. T. Inman-Dundon reviewed the record up until then and determined that Munnings-Bah had no repeated episodes of decompensation of extended duration, and no more than mild restrictions on activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.   (R. 102.)   Although Munnings-Bah had no limitations on understanding or memory, she did have limitations on sustaining concentration and persistence.  Specifically, she was moderately limited in her ability to (1) maintain attention and concentration for extended periods, (2) perform activities within a schedule, (3) maintain regular attendance, (4) be punctual within customary

---

[5] Munnings-Bah also was seen by clinical social work intern Marta Wells once, Dr. Zahra Virani twice, and psychiatric nurse practitioner Claudia Melendez, PMHNP, once.

tolerance, (5) complete a normal workday and workweek without interruptions from psychologically based symptoms, and (6) perform at a consistent pace without an unreasonable number and length of rest periods. (R. 105-06.)  Munnings-Bah also had limitations as to social interaction, but all such limitations were not significantly limiting. She further had limitations as to adaptation.  Specifically, she had moderate limitations on her ability to respond appropriately to changes in the work setting. (R. 106-07.)  Dr. Inman-Dundon ultimately found that Munnings-Bah retained the mental capacity for semi-skilled work that did not require her to work closely with others. (R. 101.)

> **b.    Opinion of Treating Psychiatrist Elishka Caneva, MD, and Claudia Melendez, PMHNP**

On March 15, 2017, Nurse Practitioner Melendez ("NP Melendez") issued a medical source statement, co-signed by Dr. Caneva, indicating they had been seeing Munnings-Bah since December 2016 for monthly psychopharmacology appointments (the "Caneva-Melendez opinion").  (R. 3141.)  They diagnosed Munnings-Bah with panic disorder and agoraphobia, and "few social supports."  She suffered from appetite, sleep, and mood disturbances; emotional lability; recurrent panic attacks; anhedonia; feelings of worthlessness; difficulty concentrating; social withdrawal; illogical thinking; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and pathological dependence.  She had a GAF score of 45.[6]  A mental status examination showed that although she was pleasant and

---

[6] GAF is "a scale that indicates the clinician's overall opinion of an individual's psychological, social, and occupational functioning," and ranges from 0 to 100. *Petrie v. Astrue*, 412 F. App'x 401, 406 n.2 (2d Cir. 2011) (citing *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 34, 376-77 (4th ed. 2000)).  "A score of 41-50 indicates serious symptoms."  *Maldonado v. Colvin*, No. 15 Civ. 4016, 2017 WL 775829, at *5 n.8 (S.D.N.Y. Feb. 28, 2017).

cooperative, her affect was constricted and her mood severely anxious.  Despite being oriented as to time, place, and person, she could not sit still and had accelerated psychomotor activity.  Her speech, however, was clear and within normal limits.  (R. 3141-42.)

Munnings-Bah's impairments had the several effects on her work-related mental abilities.  First, she had moderate loss in her ability to understand, remember, and carry out simple instructions; make simple work-related decisions; ask simple questions or request assistance; and maintain socially appropriate behavior.  Next, she had marked loss in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for two-hour segments; sustain an ordinary routine without special supervision; perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes; and set realistic goals or make plans independently of others.  Last, she had extreme loss in her ability to maintain regular attendance and be punctual, deal with the stress of semi-skilled and skilled work, work with or close to others without distraction, complete a normal workday or workweek without interruptions from her psychologically based symptoms, interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, respond appropriately to changes in a routine work setting, travel in unfamiliar places, and use public transportation.[7]  (R. 3143-44.)

---

[7] As used in the completed form, moderate loss means "[s]ome loss of ability in the named activity; can sustain performance for 2/3 or more of an 8-hour workday.  Marked loss means "substantial loss of ability in the named activity; can sustain performance only up to 1/3 of an 8-hour workday.  Extreme loss means "[c]omplete loss of ability in the named activity; [cannot] sustain performance during an 8-hour workday."  (R. 3142.)

As a result of her mental impairments, Dr. Caneva and NP Melendez also found that Munnings-Bah exhibited the following functional limitations:  she had marked restrictions on her activities of daily living and marked difficulties in maintaining social functioning; she had constant deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner; and she had repeated episodes of deterioration or decompensation at work, which caused her to withdraw from the situation or experience exacerbation of symptoms.  (R. 3144-45.)

NP Melendez and Dr. Caneva opined that Munnings-Bah would be absent from work more than three times per month.  (R. 3142.)

## C.    Hearing Testimony

At her December 27, 2017 hearing before ALJ Shire, Munnings-Bah testified about her work history and impairments.  Munnings-Bah was born in 1970 and has a master's degree in early childhood education.  (R. 39.)  She currently lives with her husband and son in a suburb of New York.  (R. 39.)  She was a teacher before the City of New York approved her application for disability retirement in February 2015.  (R. 44-46.)  Shortly after retiring, she worked for two or three months as a part-time cashier at Yankee Stadium.  (R. 53, 60.)  She has not worked since then.  (R. 65-66, 189.)

During the day, she sleeps a lot because her medication makes her drowsy.  (R. 41.)  Her husband helps her clean herself after using the bathroom, get in and out of the shower, and put on undergarments; her son helps her with the household chores.  (R. 41-42.)  Both her husband and her son help with groceries, cooking, and laundry.  (R. 76-77.)

Munnings-Bah has experienced severe back pain and sciatica every day after she was attacked by a student in 2008.  (R. 43-44.)  When she was still teaching, the large classroom size caused her anxiety and panic attacks.  (R. 43.)  She further experienced panic attacks crossing bridges, such that her father had to drive her to and from school.  (R. 44-45.)  Because of her symptoms, she was temporarily excused from taking her students on field trips.  (R. 46-47.)  Shortly after she stopped working, she was able to drive and cross bridges; she also took public transportation with a friend.  (R. 51.)  However, she was driven to the hearing by her father.  (R. 51.)  Generally, she takes paratransit to get around and has been taking taxicabs since college.  (R. 51, 64.)

When Munnings-Bah briefly worked at Yankee Stadium, she was stationed at an exclusive concession stand, thus enabling her to avoid the crowd; still, she struggled to manage her four-hour-long standing shifts and sometimes had to leave early.  (R. 53, 56, 80.)  She did manage to go on road trips to South Jersey and Canada, but had to stop throughout those trips because of her symptoms.  (R. 69, 71-72.)  She practiced yoga at Walton to help with her anxiety, but that "messed up" her shoulder and wrist.  (R. 66.)  After being discharged from physical therapy at Morris Heights, Munnings-Bah was advised to do stretching exercises with a belt.  (R. 73-74.)  She was using a cane at the time.  (R. 74.)  PT Lim wanted her to stop using it because he did not want her to become dependent on it.  (R. 74.)  Munnings-Bah nevertheless continues to use the cane all the time, except when at home, where she holds onto the walls to get around.  (R. 75.)  She needs a cane to walk, though not to stand.  (R. 86.)  She cannot lift a gallon of milk or sit for more than 30 minutes without starting to feel pain.  (R. 78, 81.)

She goes for 15- to 20-minute walks outside when the weather is good but does not socialize.  (R. 78-79.)

Following Munnings-Bah's testimony, the ALJ heard testimony from Vocational Expert Peter Manzi, Ed.D. (the "VE").  (R. 83-95.)  The ALJ presented a hypothetical individual to the VE who "could work at sedentary levels, would need a sit/stand option every 30 minutes, could only occasional[ly] interact socially with coworkers and supervisors, supervisors, and the general public, could only occasionally . . . bend, crouch, crawl, kneel" (no stairs, ladders, or ropes), could "frequently but not constantly finger with left non-dominant [hand]," and would need a job that would allow for "shift work . . . to avoid travel at peak times" (though "nothing that involves driving" on the individual's part) and permit use of a cane in either hand "for walking" – though a cane is "not absolutely" needed "the entire time she ambulates."  (R. 85-86.)  The VE testified that such an individual could not return to Munnings-Bah's past work but would be able to hold a job in the national economy.  (R. 87.)  Specifically, this individual could perform work as a lens inserter, surveillance systems monitor, or table worker.  (R. 87-88.)  At the same time, the VE confirmed that if the hypothetical individual "could only occasionally concentrate because they were off task due to [ ] panic attacks, or sedation, or sleepiness," they would not be able to sustain these jobs or any other jobs. (R. 90-91.)

**D.    The ALJ's Decision**

On April 3, 2018, ALJ Shire issued a decision concluding that Munnings-Bah was not disabled under 42 U.S.C. §§ 416(i), 423(d).  (R. 10-25.)  The ALJ followed the Administration's five-step sequential process (discussed further below) to determine

whether Munnings-Bah was disabled pursuant to 20 C.F.R. § 404.1520(a). At step one, the ALJ found that Munnings-Bah had not engaged in substantial gainful activity since February 11, 2015, her alleged onset date. (R. 12.) At step two, the ALJ found that Munnings-Bah had the following severe impairments: anxiety disorder, panic disorder with agoraphobia, degenerative disc disease and bulging discs at the lumbar spine, sciatica, obesity, and left wrist sprain. (R. 12-13.) She also had hypertension and right shoulder pain, but the former was non-severe and the latter did not meet the 12-month duration requirement. (R. 12-13.) At step three, the ALJ found that Munnings-Bah did not have an impairment or a combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 that would automatically qualify as disabling. (R. 13-15.)

Before proceeding to step four, the ALJ considered the entire record and found that Munnings-Bah had the residual functional capacity ("RFC") to perform less than the full range of "sedentary work" as defined in 20 C.F.R. § 404.1567(a). (R. 15-23.) Specifically, she could lift and/or carry up to 10 pounds occasionally, push and/or pull at similar limits, and, in an eight-hour workday, sit for up to six hours and stand and/or walk for up to two hours. (R. 15.) However, she required a sit/stand option every 30 minutes; she could only occasionally interact socially with coworkers, supervisors, and the general public; she could only occasionally bend, crouch, crawl, kneel, and climb stairs; she could not climb ladders or ropes; and she could not drive; but she could frequently, though not constantly, finger and handle with her left non-dominant hand. (R. 15.) In addition, she required a position that would allow for shift work so that she

could avoid travel at peak rush hour, and a position that would permit her to hold a cane in either hand while walking – though she did not need the cane at all times.  (R. 15.)

At step four, the ALJ found that Munnings-Bah did not have the RFC to perform the requirements of her past relevant work as a teacher.  (R. 23.)  At step five, considering Munnings-Bah's age, education, work experience, and RFC, the ALJ found that there were jobs in significant numbers in the national economy that she could perform.  (R. 23-24.)  Accordingly, the ALJ concluded that Munnings-Bah was not disabled.  (R. 24.)

## Applicable Law

### A.   Standard of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner of Social Security.  42 U.S.C. § 405(g); *Skrodzki v. Commissioner of Social Security, Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (same).

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (summary order) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (remanding for noncompliance with regulation, which resulted in incomplete factual findings)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were

based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles . . . in assessing [the plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp. 2d 507, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).  "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  *Brault*, 683 F.3d at 448 (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant's] case record."  42 U.S.C. § 423(d)(5)(B).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1).  While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.  *See Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).   The court must afford the Commissioner's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  *Valente v. Secretary of Health and Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984); *Dunston v. Commissioner of Social Security,* No. 14 Civ. 3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015).  Accordingly, if a court finds that there is substantial evidence supporting the

Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the plaintiff's position. *Genier v. Astrue*, 606 F.3d 46, 49 (2d. Cir. 2010). The court, however, will not defer to the Commissioner's determination if it is "the product of legal error." *Dunston*, 2015 WL 54169, at *4 (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

## B.   Legal Principles Applicable to Disability Determinations

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled entitling them to benefits, the Commissioner is required to conduct a five-step inquiry. 20 C.F.R. § 404.1520. First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not gainfully engaged in any activity, the Commissioner must determine whether the claimant has a "severe impairment" that significantly limits the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii). Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's

ability to perform basic work activities is considered "severe."  20 C.F.R. § 404.1520(c).

Third, if the claimant has a severe impairment, the Commissioner must determine

whether the impairment is one of those included in the Listings of the regulations

contained at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If it is, the Commissioner will

presume the claimant to be disabled, and the claimant will be eligible for benefits.  20

C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet the criteria for being presumed disabled, then the

Commissioner must next assess the claimant's RFC – that is, the claimant's ability to

perform physical and mental work activities on a sustained basis despite his or her

impairments, 20 C.F.R. § 404.1520(e) – and determine whether the claimant possesses

the RFC to perform the claimant's past work.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth and

finally, if the claimant is not capable of performing prior work, the Commissioner must

determine whether the claimant is capable of performing other available work.  20

C.F.R. § 404.1520(a)(4)(v).  The claimant bears the burden of proof at the first four

steps.  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has

established that he or she is unable to perform their past work, however, the

Commissioner bears the burden of showing that "there is other gainful work in the

national economy which the claimant could perform."  *Balsamo v. Chater*, 142 F.3d 75,

80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health and Human Services*, 705 F.2d

638, 642 (2d Cir. 1983)).

## Discussion

Munnings-Bah challenges several aspects of the ALJ's decision.  She argues

that the ALJ (1) improperly weighed the medical opinion evidence; (2) incorrectly

determined the duration of one of her impairments; (3) erred in finding that her impairments did not meet the criteria of any of the Administration's Listing of Impairments; (4) failed to properly determine her RFC; and (5) posed a deficient hypothetical to the VE. The Commissioner opposes, arguing that the ALJ's decision is supported by substantial evidence. For the reasons that follow, the Court agrees with Munnings-Bah in part. The ALJ weighed the opinion of Munnings-Bah's treating psychiatrist without the benefit of a complete medical record. That was legal error warranting remand. Additionally, the ALJ's RFC determination was not supported by substantial evidence. Accordingly, the case should be remanded for further consideration consistent with this Report and Recommendation.

## A.    The ALJ Improperly Weighed the Medical Opinion Evidence

Munnings-Bah first argues that the ALJ erred in failing to give the opinions of Drs. Natarajan and Caneva, Munnings-Bah's treating physician and psychiatrist respectively, "controlling or at least great weight." (Memorandum of Law in Support of the Plaintiff's Motion for Judgment on the Pleadings, Dkt. 22 ("Pl. Mem."), at 14.) As to Dr. Natarajan, the ALJ's decision shows that she provided good reasons for overriding the deference normally given to a treating physician's opinion, and considered the requisite factors for giving Dr. Natarajan's opinion "little" weight. With respect to the Caneva-Melendez opinion, however, there was an obvious gap in the medical evidence that triggered the ALJ's duty to develop the record. Yet the ALJ failed to do so. Accordingly, remand is required.

### 1.     The Treating Physician Rule

An ALJ must evaluate every medical opinion received.  *Rodriguez v. Colvin*, No. 12 Civ. 3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014).   A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).   Conversely, an ALJ is not required to assign a treating physician's opinion controlling weight when it is contradicted by substantial evidence in the record.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (treating physician's opinion is not controlling when "contradicted by other substantial evidence in the record").[8]

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must give "good reasons" for doing so.  20 C.F.R. § 404.1527(c)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion"); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d at 505.  Failure to provide "'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Snell*, 177 F.3d at 128; *see also Schaal*, 134 F.3d at 505 ("[T]he Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

---

[8] The regulations for evaluating medical opinions were amended in 2017, but the changes are applicable only to claims filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1527, 404.1520c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017). Because Munnings-Bah's claim was filed before that date, the Court applies the earlier regulations.

If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must then consider several factors to determine what weight it should receive: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) whether and to what extent the physician is a specialist in the area covering the particular medical issues, and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c)(2)-(6); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Selian*, 708 F.3d at 418.  After considering those factors, the ALJ must "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

A "slavish recitation of each and every factor," however, is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).  Thus, an "application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors set forth in [the regulation], even though the ALJ declines to examine the factors with explicit reference to the regulation."  *Crowell v. Commissioner*, 705 F. App'x 34, 35 (2d Cir. 2017) (summary order) (quoting *Halloran*, 362 F.3d at 32).

"The same factors also must be considered with respect to what weight to give non-treating doctors, 'with the consideration of whether the source examined the claimant or not replacing the consideration of the treatment relationship between the source and the claimant.'"  *McGinley v. Berryhill*, No. 17 Civ. 2182, 2018 WL 4212037,

at *12 (S.D.N.Y. July 30, 2018) (quoting *Butts v. Commissioner of Social Security*, No. 16 CV 874, 2018 WL 387893, at *6 (N.D.N.Y. Jan. 11, 2018)), *R. & R. adopted*, 2018 WL 4211307 (S.D.N.Y. Sept. 4, 2018).  Although the Second Circuit has cautioned that ALJs should not rely heavily on the findings of consultative physicians that arose from a single examination, *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990), a consultative physician's opinion may nonetheless constitute substantial evidence.  *See Petrie*, 412 F. App'x at 406 (affirming ALJ reliance on findings of two consultative examiners in declining to afford treating physicians controlling weight).

> **2.    The ALJ Followed the Treating Physician Rule in Weighing Dr. Natarajan's Opinion**

Dr. Natarajan opined that Munnings-Bah could not sit, stand, or walk about for extended durations; that she could never lift more than five pounds or stoop; and that, as a result of her physical impairments, she was likely to be absent from work more than three times per month.  The ALJ concluded that Dr. Natarajan's opinion "d[id] not merit much weight since [his] office notes . . . fail[ed] to document findings consistent with [his] opinion[ ]."  (R. 18, 22.)  In addition, Dr. Natarajan's opinion was inconsistent with "the conservative treatment offered" to Munnings-Bah.  (R. 18.)  Substantial evidence supports the ALJ's decision to give Dr. Natarajan's opinion "little" weight.

To begin, the ALJ articulated "good reasons" for giving Dr. Natarajan's opinion less than controlling weight, *Snell*, 177 F.3d at 133, first focusing on Dr. Natarajan's own office notes – that is, Munnings-Bah's treatment records.  Munnings-Bah saw Dr. Natarajan for the first time in mid-September 2015.  Though Munnings-Bah presented with sciatica, spinal tenderness, a painful gait, and impaired strength, Dr. Natarajan merely found her pain "mild" and prescribed her Tramadol only upon her request.  (R.

2372.)  By the end of the month, Dr. Natarajan determined that the strength in her right leg and sensation in her right foot remained diminished, but she no longer had spinal tenderness and appeared to be "in no acute distress."  (R. 2941.)

Munnings-Bah's MRI results eventually confirmed lumbar disc bulging and herniation, as well as nerve root impingement, and by the end of the year, she was walking with a cane.  (R. 3002.)  Despite the numbness in her foot and her "very painful and slow" gait, however, she still was "[n]ot interested in spinal injections."  (R. 3085.)  And after a six-month hiatus, while treating Munnings-Bah for nausea, Dr. Natarajan found that she had a normal gait, grossly normal sensation, normal extremities, normal range of motion in the back and spine, and intact muscular strength.  (R. 3287.)

In other words, substantial evidence supports the ALJ's conclusion that Dr. Natarajan's "highly restrictive opinion[ ]" was unsupported by his own treatment notes and therefore "d[id] not merit much weight."  (R. 18, 22.)  Again, Dr. Natarajan never assessed Munnings-Bah's pain as anything more than "mild."  (R. 2372.)  And, although Dr. Natarajan recommended spinal injections, Munnings-Bah did not want or need those injections.  (R. 3085.)  Finally, only a month before issuing his highly restrictive opinion, Dr. Natarajan examined Munnings-Bah's musculoskeletal and neuro systems and found them "normal."  (R. 3287.)

But that is not all.  The ALJ also took issue with Munnings-Bah's conservative treatment and how that treatment appears to conflict with Dr. Natarajan's opinion.  When PT Lim first evaluated Munnings-Bah, in January 2016, he observed that her posture and gait were unremarkable.  At the same time, she presented with reduced sensation in her right lower leg and tenderness in her lower back; the range of motion of

her back was limited, and the strength of her core, back, and lower extremities was diminished.  Munnings-Bah reported "constant" "9/10" low back pain, numbness in her entire right leg, difficulty sitting or standing for more than one hour, and "extreme" difficulty performing even "usual" activities.  (R. 3156-59.)

As Munnings-Bah progressed in her physical therapy, however, her low back pain and the tingling and numbness in her right lower leg "significantly subsided."  Her back still hurt when she was "walking a lot or negotiating [sic] stairs."  (R. 3166-68.)  But her functional limitations had improved to such an extent that PT Lim determined that she was now "able to perform work activities."  (R. 3169.)  By the time she was discharged, PT Lim graded Munnings-Bah's pain "3/10."  He reported her gait, lumbar range of motion, lower extremity strength, core and back strength, and neurological deficits (i.e., tingling and numbness) as all grossly within normal limits or better.  He concluded that Munnings-Bah had "no difficulty" sitting, standing, or walking for 30 minutes:  she had "achieved all PT goals."  (R. 3172.)  At the time of her discharge from Morris Heights, Munnings-Bah's pain and neurological symptoms had improved significantly, and her gait, strength, and range of motion all were more or less within normal limits.  (R. 3172.)

Munnings-Bah does not argue that the ALJ improperly characterized her physical therapy as "conservative."  Rather, she maintains that "the Second Circuit has repeatedly stated that a physician's recommendation of only conservative treatment does not provide substantial evidence that a claimant was not physically disabled during the relevant period."  (Pl. Mem. 19.)  Not so.  Rather, "the opinion of the treating physician [is not] to be discounted *merely* because he has recommended a

conservative treatment regimen. . . . [Such a regimen] may, however, help to support the Commissioner's conclusion that the claimant is not disabled if that fact is accompanied by other substantial evidence in the record, such as the opinions of other examining physicians and a negative MRI." *Burgess*, 537 F.3d at 129 (alterations and emphasis added).

Here, Munnings-Bah's conservative treatment was not the ALJ's sole basis for giving Dr. Natarajan's opinion little weight.  Far from it; that conservative treatment (which proved effective) was accompanied by other substantial evidence supporting the ALJ's weighting decision – namely, Dr. Natarajan's own office notes that were pointedly inconsistent with his opinion as well as with the opinion of consultative examiner Dr. Revan.  Indeed, after a thorough clinical examination, Dr. Revan opined that Munnings-Bah had at most moderate limitations on personal grooming and activities of daily living secondary to wrist and back pain; only mild-to-moderate limitations on fine and gross motor activity due to wrist pain; and merely mild-to-moderate limitations on standing, walking, laying down, and climbing stairs due to back pain.  (R. 2631.)  Dr. Revan's findings contradict Dr. Natarajan's opinion, providing additional evidence in support of the ALJ's decision to give that opinion little weight.[9]

_____

[9] Munnings-Bah argues that Dr. Revan's findings actually support rather than undermine Dr. Natarajan's opinion, because Dr. Revan diagnosed many of the same impairments and limitations that Munnings-Bah had presented with during her visits to Dr. Natarajan and PT Lim – for instance, numbness and tingling, abnormal gait, reduced lumbar range of motion, and use of a cane.  (Pl. Mem. at 17-18.)  But Munnings-Bah does not discuss Dr. Revan's opinion itself – that, *inter alia*, Munnings-Bah had no more than mild-to-moderate limitations on standing, walking, laying down, and climbing stairs – which is at odds with Dr. Natarajan's opinion.  The ALJ gave Dr. Revan's opinion "good" weight because "it is based on Dr. Revan's personal observations during a thorough exam and is in harmony with the clinical findings documented in Dr. Revan's report."  (R. 17.)  Munnings-Bah does not dispute this weighting decision.

Having properly determined not to give Dr. Natarjan's opinion controlling weight, the ALJ also applied the correct legal standards in arriving at her decision to give the opinion little weight.  The ALJ did not refer explicitly to each of the § 404.1527(c) factors: relationship, supportability, consistency, and specialization (or any other factors brought to the ALJ's attention).  *See Greek*, 802 F.3d at 375.  But her "reasoning and adherence to the regulation are clear."  *Atwater*, 512 F. App'x at 70.

In reviewing the record leading up to Dr. Natarajan's opinion, the ALJ discussed Munnings-Bah's handful of visits to Dr. Natarajan – twice in September 2015, once in December 2015, and once July 2016.  (R. 17-18.)  This suggests that the ALJ was at least aware that Munnings-Bah had seen Dr. Natarajan four times, over the course of approximately one year, before Dr. Natarajan issued his August 2016 opinion (nature and extent of relationship).  Furthermore, the ALJ specifically examined all of the treatment records underlying Dr. Natarajan's opinion.  According to the ALJ, Dr. Natarajan's opinion was inconsistent with the "benign findings" in those treatment records (supportability).  (R. 18.)  As already noted, Dr. Natarajan's opinion also was at odds with the "conservative treatment" that Munnings-Bah subsequently received from PT Lim (consistency).  (R. 18.)

Moreover, the ALJ considered and rejected Dr. Natarajan's claim that Munnings-Bah's condition has persisted since 2008; after all, the record shows that she had been performing light skilled work as a teacher, at substantial gainful activity levels, until early 2015 (consistency).  (R. 18.)  And although the ALJ did not note Dr. Natarajan's specialization in her decision, three of the four relevant treatment records are prominently labelled "The Institute for Family Health" or "Family Practice," which

suggests that Dr. Natarajan was a family doctor or general practitioner (specialization). (R. 2940, 3085, 3286.)  Having reviewed Dr. Natarajan's records, the ALJ would have been cognizant of and accounted for this fact.  In other words, although the ALJ did not expressly recite consideration of each of the requisite factors, the decision clearly explains the ALJ's reasoning and demonstrates adherence to the regulation.  *See Crowell*, 705 F. App'x at 35; *Atwater*, 512 F. App'x at 70.

In sum, substantial evidence – stark inconsistency with Dr. Natarajan's own office notes; the efficacy of Munnings-Bah's conservative treatment; and Dr. Revan's opinion – supports the ALJ's decision to give Dr. Natarajan's opinion little weight.

### 3.    The ALJ Failed to Develop the Record to Properly Evaluate the Caneva-Melendez Opinion

Although the ALJ did not err in evaluating the medical source opinions regarding Munnings-Bah's physical condition, she erred in evaluating the opinions concerning Munnings-Bah's psychological condition, particularly that of treating psychiatrist Dr. Caneva and NP Melendez.[10]

To review, Dr. Caneva and NP Melendez opined that Munnings-Bah had marked or extreme losses in more than half of her work-related mental abilities.  As a result, she

---

[10] For purposes of the treating physician rule, a nurse practitioner is not an "acceptable medical source" whose opinion is entitled to controlling weight.  *Monette v. Colvin*, 654 F. App'x 516, 518 (2d Cir. 2016).  In other words, under the regulations, nurse practitioners are not "treating physicians" to whom the treating physician rule applies. *See* 20 C.F.R. § 404.1502(a); SSR 06-03p, 2006 WL 2329939, *1-2 (Aug. 9, 2006). That said, an ALJ "may consider evidence from 'other sources,'" including nurse practitioners, *Baron v. Astrue*, No. 11 Civ. 4262, 2013 WL 1245455, at *26 (S.D.N.Y March 4, 2013), *R. & R. adopted*, 2013 WL 1364138 (S.D.N.Y March 26, 2013), and courts have reviewed ALJ decisions to ensure that the opinion of a nurse practitioner is "nevertheless considered, not overlooked," *Monette*, 654 F. App'x at 518.  In any event, the opinion is also that of Dr. Caneva, who does qualify as a "treating physician" presumptively entitled to controlling weight.  *See* 20 C.F.R. § 404.1502(a).

had marked restrictions on her activities of daily living and marked difficulties in maintaining social functioning.  She also would have had constant deficiencies in concentration, persistence, or pace, as well as repeated episodes of deterioration or decompensation at work.  Consequently, Munnings-Bah was likely to be absent from work more than three times per month.

The ALJ concluded that the Caneva-Melendez opinion "d[id] not merit much weight," however, "since the office notes from these providers fail[ed] to document findings consistent with their opinion[ ]."  (R. 22.)  Furthermore, Dr. Caneva and NP Melendez's "assessments . . . conflict greatly with the objective findings detailed in psychological evaluations throughout the record."  (R. 21.)

Munnings-Bah argues, among other things, that although Dr. Caneva and NP Melendez began treating her in December 2016, all but one of the treatment notes are absent from the record, and there are no documented attempts by the ALJ to obtain the missing records.  As such, the ALJ violated her duty to develop the record.  (Pl. Mem. at 21 n.20.)  The Commissioner does not respond to this argument.  Having reviewed the record, the Court agrees with Munnings-Bah.  The ALJ failed to adequately develop the record.  Accordingly, the Court cannot determine whether the ALJ's decision to give little weight to the Caneva-Melendez opinion applied the correct legal standards or was supported by substantial evidence.

### a.    The ALJ's Duty to Develop the Record

"[T]he 'treating physician rule' is inextricably linked to the [ALJ's] duty to develop the record."  *Lacava v. Astrue*, No. 11 Civ. 7727, 2012 WL 6621731, at *13 (S.D.N.Y. Nov. 27, 2012), *R. & R. adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).  "Before determining whether the Commissioner's conclusions are supported by substantial

evidence," a court "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran*, 569 F.3d at 112 (alterations in original) (quoting *Cruz*, 912 F.2d at 11). It is well settled that even when the claimant is represented by counsel, the ALJ has an affirmative duty to develop the medical record and seek out further information where the physician's reports are inconsistent and where gaps exist in the record. *See Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").

Courts hold that where, as here, psychiatric impairments are at issue, an ALJ has a heightened duty to develop the record due to the difficulties associated with evaluating a mental illness' impact on a claimant's ability to function adequately in a workplace. *See, e.g.*, *Estrella v. Commissioner of Social Security*, No. 12 Civ. 6134, 2016 WL 5920128, at *3 (S.D.N.Y. Oct. 7, 2016); *Santiago v. Commissioner of Social Security*, No. 13 Civ. 3951, 2014 WL 3819304, at *15 (S.D.N.Y. Aug. 4, 2014); *see also Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 514 (2d Cir. 2002) ("[C]ourts should exercise an extra measure of caution when adjudicating the claims of a litigant whose mental capacity is in question."); *Gabrielsen v. Colvin*, No. 12 Civ. 5694, 2015 WL 4597548, at *4 (S.D.N.Y. July 30, 2015) (collecting cases).

Legal errors regarding the duty to develop the record are a threshold issue warranting remand. *See Rosa v. Callahan*, 168 F.3d 72, 79-80 (2d Cir. 1999) (remanding where ALJ failed to fully develop record by failing to obtain or attempting to obtain records).

### b.    The ALJ's Duty to Develop Medical History

As part of their duty to develop the record, an ALJ must "investigate the facts and develop the arguments both for and against granting benefits."  *Sims v. Apfel*, 530 U.S. 103, 111 (2000).  "Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history."  *Craig v. Commissioner of Social Security*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).  "This responsibility 'encompasses . . . the duty to obtain a claimant's medical records and reports . . . .'"  *Id.* (quoting *Pena v. Astrue*, No. 07 Civ. 11099, 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008)); *see* 42 U.S.C. § 423(c)(5)(B) ("In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.").

The regulations set forth that the Commissioner will "develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary . . . ."  20 C.F.R. § 416.912(b)(1); *DeChirico v. Callahan*, 134 F.3d 1177, 1184 (2d Cir. 1998) ("[Plaintiff] is correct that, by statute, the ALJ was required not only to develop [Plaintiff's] complete medical history for at least the twelve-month period prior to the filing of his application, but also to gather such information for a longer period if there was reason to believe that the information was necessary to reach a decision."). However, "where there are no obvious gaps in the administrative record, and where the

ALJ already possesses a 'complete medical history,' the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim."  *Rosa*, 168 F.3d at 79 n.5.

      **c.**      **The ALJ Failed to Develop the Record of Munnings-Bah's Visits to Dr. Caneva and NP Melendez**

The ALJ concluded that the Caneva-Melendez opinion "d[id] not merit much weight since the office notes fail[ed] to document findings consistent with their opinion[ ]" and for being "based on only a few months of treatment."  (R. 21.)  The ALJ drew her conclusion about lack of consistency, however, without having in hand most of the records for Munnings-Bah's treatment with Dr. Caneva and NP Melendez.

In their medical source statement, under "frequency and length of contact," Dr. Caneva and NP Melendez wrote that Munnings-Bah had been seeing them "since December 2016 . . . for psychopharmacology appointments monthly."  (R. 3141.)  The record, however, contains no more than a single progress note from Munnings-Bah's February 13, 2017 visit to NP Melendez.  At that visit, Munnings-Bah reported anxiety, appetite changes, depressed mood, loss of energy, concentration difficulties, sleep disturbances, and social withdrawal.  NP Melendez did not perform a mental status examination of Munnings-Bah but determined that she tested "[p]ositive for difficulty with concentration."  (R. 3300.)  Missing from the records, however, are progress notes from December 2016 and January 2017, and perhaps March 2017, the month Dr. Caneva and NP Melendez issued their opinion.

The ALJ thus assessed the consistency of the Caneva-Melendez opinion based on only one-third and perhaps one-quarter of the treatment notes underlying that opinion.  The missing records were an obvious gap, particularly as the ALJ recognized

that Munnings-Bah had seen Dr. Caneva and NP Melendez on a monthly basis.  Yet there is no indication in the record that the ALJ made any effort to determine if there were treatment records for the missing months.  Without the benefit of these missing treatment records, the Court has no confidence that the ALJ had good reasons not to give the Caneva-Melendez opinion controlling weight and, even if less than controlling, what weight to give it under the requisite regulatory factors.  In particular, the ALJ would have had materially incomplete information for assessing the relationship and supportability factors.  *See* 20 C.F.R. § 404.1527(c)(2), (3).

The Court recognizes that the overall record is quite robust, but even a robust 3,300-page record can have obvious gaps that are material to the ALJ's decision.  The Court also appreciates that the record contains progress notes from Munnings-Bah's 21 visits to Dr. Yung (treating psychiatrist) and 31 visits to Ms. Schulman (psychotherapist), spanning from 2014 to 2016.  But the visits to Ms. Schulman ended in January 2016, and those to Dr. Yung in July 2016.  There thus is a break of five months or so between Munnings-Bah's last visit to Dr. Yung and her first visit to Dr. Caneva and NP Melendez in December 2016.  During that time, Munnings-Bah's condition could have deteriorated such that the Caneva-Melendez opinion "suggest[ing] moderate to extreme limitations" may turn out to be well founded.  (R. 21.)  Of course, that may not be the case, and the ALJ may still conclude that the Caneva-Melendez opinion is entitled to little weight.  But that is not a determination for this Court to make, and the ALJ cannot make that determination without properly developing the record.

Because the ALJ did not fulfill her duty to develop the medical history, remand is required.  *See Rodriguez v. Commissioner of Social Security*, No. 19 Civ. 6855, 2020

WL 3968267, at *18 (S.D.N.Y. July 14, 2020) (remanding for failure to obtain additional treatment notes from claimant's psychiatrist)*; Clark v. Commissioner of Social Security*, No. 15 Civ. 8406, 2017 WL 1162204, at *3-4 (S.D.N.Y. March 27, 2017) (remanding for failure to obtain complete notes from plaintiff's treating mental health professional); *Villarreal v. Colvin*, No. 13 Civ. 6253, 2015 WL 6759503, at *21 (S.D.N.Y. Nov. 5, 2015) (remanding for failure to investigate missing report in treating physician's record); *cf. Craig v. Commissioner of Social Security*, 218 F. Supp. 3d 249, 268 (S.D.N.Y. 2016) ("The absence of any treatment records from [the claimant's treating psychiatrist], with no documented attempts by the ALJ to obtain them, is such a clear violation of the ALJ's duty to develop the record that it is not unheard of in such cases for the Commissioner to affirmatively move to remand the case on that basis.")

**B.     The ALJ Correctly Determined That Munnings-Bah's Right Shoulder Impairment Did Not Meet Step Two's Duration Requirement**

Munnings-Bah next argues that the ALJ erred in finding that Munnings-Bah failed to show that her right shoulder impairment persisted for a 12-month consecutive period. Munnings-Bah maintains that there is no evidence that her right shoulder pain resolved and that the ALJ therefore should have developed the record if she felt that the record was inadequate.  The record demonstrates, however, that the ALJ correctly determined that Munnings-Bah right shoulder plain did not meet the duration requirement.  Nor was there any obvious gap in the medical evidence that would trigger the ALJ's duty to develop the record in that respect.

At step two, the ALJ was required to consider whether Munnings-Bah's medically determinable impairment or combination or impairments is "severe" and meets the "duration requirement."   An impairment is severe if it significantly limits a claimant's

physical or mental ability to do basic work activities, and meets the duration requirement if it has lasted or is expected to last for a continuous period of at least 12 months. 20 C.F.R. §§ 404.1509, 1520(c). If a claimant does not have a severe impairment that meets the duration requirement, then she is not disabled because of that impairment. 20 C.F.R. § 404.1520(a)(4)(ii).

Here, the ALJ found that Munnings-Bah's right shoulder pain was non-severe because Munnings-Bah did not show that her pain persisted for a 12-month consecutive period. Specifically, the ALJ considered the record of Munnings-Bah's walk-in consultation with family practitioner Sarah Miller, MD., dated August 5, 2016 (R. 3292); Dr. Rupa Natarajan's medical source statement identifying right rotator cuff impingement as one of Munnings-Bah's diagnoses, dated August 26, 2016 (R. 3148); and records from Munnings-Bah's visits to Morris Heights for right shoulder physical therapy, dated October 25, 2016 to January 25, 2017 (R. 3178-90). From these treatment records, which span only about five months, the ALJ concluded that Munnings-Bah's right shoulder pain did not meet step two's duration requirement.

Munnings-Bah argues that there is no evidence in the record showing that her pain resolved, and that the ALJ therefore had an affirmative duty to develop the record to obtain records pertaining to Munnings-Bah's shoulder impairment following January 25, 2017. However, the Court's independent review of the record as it pertains to Munnings-Bah's shoulder confirms the absence of any "obvious gaps" that would have triggered the ALJ's duty to further develop it.

When Munnings-Bah first sought treatment for her shoulder on August 5, 2016, she complained of pain that had started two weeks beforehand. Dr. Miller suspected a

"[p]ossible mild rotator cuff injury."   A shoulder exam revealed that Munnings-Bah enjoyed "full range of motion" and experienced "pain with lateral extension only"; she had no tenderness or deformity.   Dr. Miller prescribed her a short course of non-steroidal anti-inflammatories, and advised her to rest, perform stretching exercises, and apply warm compresses.  (R. 3292.)  Three weeks later, however, Dr. Natarajan opined that Munnings-Bah had "constant[ ]" and "severe" pain in her right shoulder, with significant range of motion limitations.  (R. 3148.)  At her first physical therapy session at Morris Heights, Munnings-Bah presented with 7/10 pain at 95 degrees abduction.  (R. 3813.)  But by January 25, 2017, she had only 2/10 pain at 160 degrees abduction.  (R. 3190.)  That same day, she was discharged to a "Home Exercise Program" and has not sought other treatment since.  Accordingly, the record suggests that the treatment of Munnings-Bah's shoulder had come to a conclusion.  There was no reason for the ALJ to suspect otherwise.[11]

Because Munnings-Bah does not point to any obvious gaps in the record and because this Court finds none, the ALJ did not violate her duty to further develop the record with respect to Munnings-Bah's shoulder injury.  *See Miller v. Commissioner of Social Security Administration*, 784 F. App'x 837, 839 (2d. Cir. 2019) (summary order) (no duty to develop record where claimant "does not specify which providers' records were missing or what those records would show," and reviewing court confirmed "record did not contain any obvious gaps that would require the ALJ to further develop the record"); *Bushey v. Colvin*, 607 F. App'x 114, 115-16 (2d Cir. 2015) (summary order)

---

[11] At the hearing, the ALJ asked Munnings-Bah to testify about her right shoulder physical therapy, but neither she nor her attorney raised any concern about the completeness of the record.  (R. 73.)

(no duty to develop record where claimant did not point to any evidence "that was not included in the record but could have influenced the Commissioner's decision," and reviewing court found "nothing in the record that would have given the Commissioner reason" to believe such evidence existed); *see also Castagna v. Berryhill*, No. 16 Civ. 6908, 2017 WL 3084903 (S.D.N.Y. July 20, 2017) ("The ALJ's duty to develop the record is not a duty to go on a fishing expedition.").   In short, Munnings-Bah did not meet her burden to show that her right shoulder pain satisfies step two's duration requirement, and the ALJ did not fail to develop the record as it relates to her shoulder.

**B.   The ALJ's Finding That Munnings-Bah's Impairments Did Not Meet Listing 12.06**

Munnings-Bah also argues that the ALJ erred at step three by finding that she did not meet the criteria of 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.06 ("Listing 12.06") for anxiety disorders.   To meet the criteria of Listing 12.06, a claimant must come forth with medical documentation of anxiety disorder, panic disorder or agoraphobia, or obsessive-compulsive disorder.   Anxiety disorder is characterized by three or more of the following:   (1) restlessness, (2) easily fatigued, (3) difficulty concentrating, (4) irritability, (5) muscle tension, or (6) sleep disturbance (the "paragraph A criteria").   § 12.06A.   The claimant must then satisfy the requirements of either paragraph B or paragraph C.

Paragraph B requires the claimant to show extreme limitation of one, or marked limitation of two, of the following areas of functioning:   (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; (4) adapt or manage oneself.   § 12.06B.   Paragraph C requires the claimant to show that she has a medically documented history of the existence of her disorder over a period

of at least two years, and to present evidence of both (1) medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of the claimant's mental disorder; and (2) the claimant's minimal capacity to adapt to changes in her environment or to demands that are not already part of her daily life.  § 12.06C.

The present dispute concerns Paragraph B.[12]  The ALJ found that Munnings-Bah's mental impairments did not satisfy the Paragraph B criteria because evidence of those impairments did not establish one extreme or two marked limitations.  Specifically, the ALJ found that Munnings-Bah had mild limitations in understanding, remembering, or applying information; moderate limitations in interacting with others; moderate limitations on her ability to concentrate, persist, or maintain pace; and moderate limitations on her ability to adapt or manage herself.

Munnings-Bah argues, *inter alia*, that Dr. Caneva and NP Melendez opined that she had marked difficulties in maintaining social functioning and constant deficiencies of concentration, persistence, and pace.  As discussed above, however, the ALJ could not have properly weighed Caneva-Melendez opinion because the ALJ failed to develop the record.  Accordingly, the ALJ will need to reconsider the Paragraph B analysis upon further developing the record on remand.

---

[12] The ALJ did not discuss whether Munnings-Bah met her burden to show that she did in fact have anxiety order (i.e., the Paragraph A criteria) but appears to have taken for granted that she did.  As to the Paragraph C criteria, the ALJ decided that "the evidence failed to establish the presence of 'paragraph C' criteria."  (R. 14.)  The parties' submissions do not dispute this finding.

**C.      Errors in the ALJ's RFC Determination**

On remand, the ALJ also will need to take into account aspects of her

determination of Munnings-Bah's RFC that are not supported by substantial evidence.

> **1.      The ALJ's Determinations regarding Munnings-Bah's Ability to Sit, Stand, Walk, Lift, and Carry Are Not Supported by Substantial Evidence**

In making a RFC determination, the ALJ must consider a claimant's physical

abilities, mental abilities, symptomology, including pain and other limitations, which

could interfere with work activities on a regular and continuing basis.   20 C.F.R. §

404.1545(a).   RFC means "what an individual can still do despite his or her limitations . .

. .  Ordinarily, RFC is the individual's maximum remaining ability to do sustained work

activities in an ordinary work setting on a regular and continuing basis, and the RFC

assessment must include a discussion of the individual's abilities on that basis.   *Melville*

*v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96-8p, 1996 WL 374184, at *2

(July 2, 1996)).

The ALJ determined that Munnings-Bah could sit for six hours, stand or walk two

hours, and lift or carry 10 pounds.   (R. 15.)  But neither the sit/stand/walk determination

nor the lift/carry limitation are supported by substantial evidence.    Besides Dr.

Natarajan's highly restrictive opinion, which the ALJ assigned only little weight, the only

opinions on point are from PT Lim and Dr. Revan.[13]   PT Lim concluded that Munnings-

_____

[13] As with the opinion of a practicing nurse, the opinion of a physical therapist does not qualify as an "acceptable medical source" opinion for purposes of the treating physician rule, *see* 20 C.F.R. § 404.1502(a), but may and should still be considered by the ALJ in determining whether a claimant is disabled.   *See Littlefield v. Colvin*, No. 15 Civ. 9640, 2017 WL 4221142, at *24 n.5 (S.D.N.Y. Aug. 31, 2017)  ("Although physical therapists are not acceptable medical sources, the opinions of physical therapists may constitute substantial evidence where the opinions are well documented and supported by the

Bah had "no difficulty" sitting, standing, or walking for 30 minutes.  (R. 3172.)   As Munnings-Bah accurately observes, however, "the ability to sit, stand, or walk for 30 minutes in no way indicates [she] could sit six hours and walk or stand two hours in an eight-hour workday, which are the requirements of sedentary work."  (Pl. Mem. at 17.)

Dr. Revan opined that Munnings-Bah had only "mild to moderate limitations for walking, standing, laying down, walking [sic], and climbing stairs due to back pain."  (R. 2631.)  But "mild to moderate" is not defined in Dr. Revan's opinion,[14] and in speculating about what that means, the ALJ, and the reviewing court, run the risk of impermissibly substituting their own opinion for Dr. Revan's.  *See Shaw v. Carter*, 221 F.3d 126, 134 (2d Cir. 2000) ("Neither the trial judge nor the ALJ is permitted to substitute his own expertise or view of the medical proof for the [ ] physician's opinion."); *see also Selian*, 708 F.3d at 421 ("[Consultative Examiner's] opinion is remarkably vague.   What [Consultative Examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's

_____

medical evidence.") (citation omitted), *R. & R. adopted*, 2017 WL 4221082 (S.D.N.Y. Sept. 21, 2017); *accord* SSR 06-03p, 2006 WL 2329939, at *6; *see also Lane v. Saul*, No. 18 Civ. 5523, 2020 WL 3965257, at *10 (S.D.N.Y. March 16, 2020) ("the ALJ must still 'explain the weight given to opinions from these sources' or otherwise show that such opinions were considered" (quoting 20 C.F.R. § 416.927(f)(2))), *R. & R. adopted*, 2020 WL 1876325 (S.D.N.Y. April 15, 2020).

[14] The Administration's Programs Operations Manual System ("POMS"), which is the primary source of information used by the Administration's employees to process claims for benefits, do define "mild" and "moderate," but only for the purposes of an ALJ's evaluation of a claimant's mental impairments at step three.  *See, e.g.*, SSA POMS DI 34001.032 § 12.00(F)(2) (Mild:    "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited."  Moderate: "Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair."); *see also* 20 C.F.R. § 404.1520a(d).   With respect to the required contents of a consultative examiner's report, POMS imposes no such rating scale.   It simply explains that "a CE report must reflect accepted professional medical standards and practice" and "should be complete enough to show the nature, severity, and duration of the impairment and the claimant's ability to function."   SSA POMS DI 22510.015(B).

sheer speculation. . . . At a minimum, the ALJ likely should have contacted [Consultative Examiner] and sought clarification of his report.") (internal citations omitted); *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000) (consultative examiner's "use of the terms 'moderate' and 'mild,' without more information" made opinion "so vague as to render it useless").

The ALJ thus had no opinion evidence on which to base her conclusion that Munnings-Bah could sit or six hours and stand or walk for two hours in an eight-hour day.   As such, her determination in that regard was not supported by substantial evidence.   *See Balsamo*, 142 F.3d at 81 ("In the absence of a medical opinion to support the ALJ's finding as to [claimant's] ability to perform sedentary work, it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.'") (quoting *McBrayer v. Secretary of Health and Human Services*, 712 F.2d 795, 799 (2d Cir. 1983)); *Filocomo v. Chater*, 944 F. Supp. 165, 170 (E.D.N.Y. 1996) ("In the absence of supporting expert medical opinion, the ALJ should not have engaged in his own evaluations of the medical findings.").

The ALJ also had no basis to conclude that Munnings-Bah could lift and carry up to 10 pounds.  Besides Dr. Natarajan, who opined that Munnings-Bah could "never" lift or carry more than five pounds (R. 3152), the only other medical provider who addressed the functional limitations caused by Munnings-Bah's shoulder pain is PT Lim, who opined that she still had "difficulty" lifting and carrying more than five pounds (R. 3188).   No other opinion addresses the issue. At the same time, as the ALJ acknowledged, Munnings-Bah testified that she was "unable to lift more than 5 pounds" and "is unable to lift a gallon of milk."   (R. 15-16).   Yet neither the ALJ nor the

Commissioner pointed to any substantial evidence in the record suggesting that Munnings-Bah could lift more than five pounds.  On remand, the ALJ should consider asking Dr. Revan for an explanation of what "mild to moderate" means as appears in her examination report.  The ALJ may also consider obtaining another consultative examination to address the lift/carry issue.[15]

### 2.    The ALJ's Consideration of Munnings-Bah's Activities of Daily Living and Work Activities Also Is Flawed

To support her RFC determination, the ALJ relied on Munnings-Bah's activities of daily living and work during the relevant period.   (R. 21-22.)   With respect to daily activities, for example, Munnings-Bah helps her husband and son with cooking and laundry, and attends church services and medical appointments. (R. 21.)   Lived experience suggests, however, that these are all activities of limited duration.  As aptly noted by Munnings-Bah, none of them "indicate[ ] that she [is] capable of sitting . . . for six hours during an eight-hour workday."  (Pl. Mem. at 29.)

As for work during the relevant period, Munnings-Bah's job as a cashier at Yankee Stadium during the summer of 2015 did require her to stand for four or five-to-seven hour shifts.  But she worked there for only three months or so – and only when the Yankees were playing at home.  (R. 56, 80.)  Even then, she sometimes had to leave early because of her pain.  (R. 80.)  Her work at Yankee Stadium thus was part-time, short-lived, and caused pain preventing a full day of work.  If anything, Munnings-

---

[15] Pursuant to SSR 96-8p, an ALJ "must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'  While a 'not severe' impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may – when considered with limitations or restrictions due to other impairments – be critical to the outcome of a claim."  (Pl. Mem. at 23 (quoting SSR 96-8p, 1996 WL 374184, at *5).)

Bah's stint at Yankee Stadium suggests that she was not able to sustain even part-time work.

The ALJ also took note of Munnings-Bah's "weekly yoga class," finding it "in contradiction to her allegedly disabling musculoskeletal and psychological impairments." (R. 22.)  But Munnings-Bah was referred to that class by her psychiatrist Dr. Yung, and her classes generally consisted of "strengthening exercises, stretching, back care, relaxation and breathing techniques."  (R. 66, 1910-11.)  The fact that Munnings-Bah participated in yoga as a form of therapy does not provide meaningful insight into Munnings-Bah's ability to perform sustained work on a regular and continuing basis – all the more so as the record does not indicate how rigorous or long the classes were.

In short, Munnings-Bah's daily activities and work experience, at least without more information, do not provide substantial evidence supporting the ALJ's RFC determination.  *See Stellmaszyk v. Berryhill*, No. 16 Civ. 09609, 2018 WL 4997515, at *25 (S.D.N.Y. Sept. 28, 2018) ("courts have recognized that a claimant's ability to engage in certain life activities that involve sitting does not necessarily mean that the claimant is capable of meeting the full requirements of sedentary work") (collecting cases); *Woodward v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000) ("a claimant's ability to engage in self-care and other domestic activities does not by itself establish that the claimant is not disabled"; "the mere fact that someone is able to remain seated for a plane ride does not establish that he can sit for six hours on a regular basis" (citation omitted)); *see also Mendolia v. Astrue*, No. 10 CV 0417, 2013 WL 3356960, at *5 n.8 (E.D.N.Y. July 3, 2013) ("physical exercise such as pilates, yoga, and swimming

may be performed at any level, even by those who cannot perform work in the national economy").

### 3. The ALJ Failed to Consider Munnings-Bah's Moderate Limitations in Concentration, Persistence, and Maintaining Pace

Munnings-Bah also argues that in determining her RFC (and posing hypotheticals to the VE) the ALJ failed to account for her own finding at step three that Munnings-Bah had moderate limitations in concentration, persistence, and maintaining pace. (Pl. Mem. at 26 (citing R. 14).) The Court agrees. On remand and upon full development of the record, the ALJ should properly account for Munnings-Bah's mental limitations in her RFC determination.

The ALJ correctly explained that "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." (R. 14-15.) SSR 96-8p, 1996 WL 374184, at *4. Indeed, when a claimant suffers from a mental impairment, the ALJ must employ a "special technique" at each step of her sequential analysis. *Rosado v. Barnhart*, 290 F. Supp. 2d 431, 437 (S.D.N.Y. 2003).

The ALJ must assess the claimant's mental RFC by engaging in a detailed evaluation of the claimant's ability to perform "work-related functions" that include her ability to (1) "understand, carry out, and remember instructions"; (2) "use judgment in making work-related decisions"; (3) "respond appropriately to supervision, coworkers and work situations"; and (4) "deal with changes in a routine work setting." SSR 96-8p, 1996 WL 374184, at *6; *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 515-16 (S.D.N.Y.

2003).  Furthermore, "the ALJ's RFC findings 'must include a narrative discussion' that describes 'how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence,' and addresses 'the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis.'"  *Brown v. Commissioner for Social Security*, No. 15 Civ. 4913, 2016 WL 7637285, at *9 (S.D.N.Y. June 29, 2016) (quoting SSR 96-8p, 1996 WL 374184, at *7), *R. & R. adopted*, 2016 WL 7646997 (S.D.N.Y. Dec. 30, 2016).

Here, the ALJ's analysis of Munnings-Bah's capacity to perform work-related functions in light of her "nonexertional" (i.e., mental) limitations consists of one sentence:  "her anxiety complaints warrant some limitations on her social interactions and support the need for shift work so that she can travel during less congested periods."  (R. 23.)  There is no "narrative discussion," nor is the ALJ's conclusion directly tied to any evidence or facts.  Moreover, the ALJ's assessment appears to relate more to the ALJ's finding that Munnings-Bah had moderate limitations in interacting with others rather than have anything to do with her moderate limitations in concentration, persistence, and pace.  (*Compare* R. 23, *with* R. 14.)

In *McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014), the Second Circuit held that an ALJ's failure to explicitly incorporate any limitations in concentration, persistence, and pace in her RFC determination and hypotheticals posed to the VE was error.  *McIntyre* also made clear, however, that there are circumstances in which such an error should be considered harmless.  "Specifically, an ALJ's omission from a hypothetical of any explicit reference to a claimant's limitation in concentration, persistence, and pace should be found harmless, either where (1) the medical evidence

demonstrates that the claimant can engage in simple, routine tasks or unskilled work despite limitations in 'concentration, persistence, and pace,' and the challenged hypothetical is limited to include only unskilled work; or (2) the hypothetical otherwise implicitly accounts for the claimant's limitations."  *Stellmaszyk*, 2018 WL 4997515, at *27 (citing *McIntyre*, 758 F.3d. at 152).

Having reviewed the ALJ's RFC determination, the related hypotheticals, and the underlying opinion evidence, the Court concludes that a lack of clarity in the record and a lack of transparency in the ALJ's reasoning deprive the Court of the ability to conduct a meaningful harmless error review and thus warrant remand.  As to the first *McIntyre* prong, the ALJ's hypothetical to the VE did not incorporate a limitation to unskilled work. Nor does the opinion evidence shed light on Munnings-Bah's work ability:   under "Findings of Fact and Analysis of Evidence," State Agency reviewer Dr. Inman-Dundon opined that Munnings-Bah "retains the mental capacity for semi-skilled work, not working closely with others"; but he did not discuss Munnings-Bah's moderate limitations in concentration, persistence, and pace, or articulate how these limitations would affect Munnings-Bah's ability to stay on task in a work environment over the course of an eight-hour workday.  (R. 101.)

With respect to the second *McIntyre* prong, the ALJ's hypotheticals to the VE did not expressly or implicitly account for Munnings-Bah's limitations in concentration, persistence, and pace.   At the hearing, the ALJ did ask the VE to consider a hypothetical individual who "could only occasionally concentrate because they were off task due to either panic attacks, or sedation, or sleepiness."  (R. 90.)  In response, the VE testified that such an individual would not be able to sustain "these jobs [(lens

inserter, table worker, surveillance system monitor)] . . . [o]r any other jobs." (R. 90-91.) The ALJ did not, however, discuss this hypothetical anywhere in her decision. As the *Stellmaszyk* court explains,

> This omission by the ALJ is especially problematic in light of the fact that, when asked to make this seemingly relevant assumption, the VE concluded that the hypothetical individual would not be able to sustain employment. If it was the ALJ's view that, due to Plaintiff's limitations in concentration, attention, and the ability to maintain a schedule, she was likely to be off task for some percentage of the workday, then the ALJ should have made this clear in his RFC determination and taken the VE's testimony on this point into account; if this was not his view, then this, too, should have been explained.

*Stellmaszyk*, 2018 WL 4997515, at *28. As the record stands, the Court cannot determine whether and to what extent the ALJ accounted for Munnings-Bah's moderate limitations in concentration, persistence, and pace in making her RFC determination. Nor can the Court determine whether the ALJ's failure to explicitly incorporate Munnings-Bah's nonexertional limitations into the RFC and hypotheticals was harmless error.

Once Munnings-Bah's psychiatric history is fully developed, the ALJ's Paragraph B analysis and RFC determination may or may not change. Either way, on remand, the ALJ should (1) state each of the nonexertional limitations that she determines Munnings-Bah to have had during the relevant period; (2) consider the combined effect of those limitations in her RFC determination; and, if necessary, (3) recall the VE for additional testimony to respond to hypotheticals that explicitly incorporate the determined limitations.

**4.    The ALJ's Determination That Munnings-Bah Does Not Need a Cane at All Times Is Not Supported by Substantial Evidence**

Munnings-Bah further argues that the ALJ's RFC determination was flawed because the ALJ's finding that Munnings-Bah does not need a cane at all times is unsupported by substantial evidence.  The Court again agrees.

The ALJ observed that although treatment records from December 2015 onward note the use of a cane, on "balance" the records do not so note.  (R. 17.)  That reasoning is flawed.  A treatment provider's decision not to mention use of a cane does not mean that the patient was not in fact using a cane at the time.  *See Martinez v. Colvin*, No. 15 Civ. 3366, 2016 WL 11483844, at *20 (S.D.N.Y. Aug. 22, 2016) ("[The] ALJ [ ] appears to rely on the fact that several treatment notes . . . do not reference a cane to support his determination that plaintiff did not require a cane . . . . [T]he Commissioner [cannot] rely primarily on the absence of evidence to support any finding concerning disability." (citing *Rosa*, 168 F.3d at 81)), *R. & R. adopted*, 2016 WL 5338554 (S.D.N.Y. Sept. 23, 2016).  Indeed, Munnings-Bah once reported to Dr. Yung that she tripped over herself because she was not using a cane.  (R. 3280.)

In opposition, the Commissioner points to Dr. Revan's examination report, where Dr. Revan commented that Munnings-Bah "[n]eeded no help changing for exam or getting on and off exam table" and "[w]as able to rise from chair without difficulty."  (R. 2629.)  But Dr. Revan's report does not address one way or the other whether Munnings-Bah used a cane while changing, getting on and off the table, or getting up from her chair.

To the contrary, the only evidence on use of a cane comes from Dr. Natarajan's opinion that Munnings-Bah needs a cane both for standing and for walking on all

surfaces and terrains.  With the ALJ having afforded Dr. Natarajan's opinion little weight, there is no opinion evidence as to whether and under what circumstances Munnings-Bah needs to use a cane to support the ALJ's determination that Munnings-Bah does not need a cane at all times.  On remand, the ALJ should consider further developing the record on this issue if it is to remain a basis for her decision.

## D.    The Hypothetical Posed by the ALJ

Munnings-Bah last argues that the ALJ posed a deficient hypothetical to the vocational expert because that hypothetical did not address (1) the ALJ's Paragraph B finding that Munnings-Bah had moderate limitations on concentration, persistence, and maintaining pace; (2) Dr. Natarajan's opinion and the Caneva-Melendez opinion that Munnings-Bah would be absent from work more than three times a month; and (3) Dr. Natarajan's opinion that Munnings-Bah would need a cane both for standing and for walking on all surfaces and terrains (i.e., at all times).

When a hypothetical posed to a VE is based on a RFC determination that in turn is supported by substantial evidence, that hypothetical is proper, and the ALJ is entitled to rely on the VE's testimony.  *Snyder v. Colvin*, 667 F. App'x 319, 321 (2d Cir. 2016) (summary order); *see also Wavercak v. Astrue*, 420 F. App'x 91, 94 (2d Cir. 2011) (summary order) ("Because we have already concluded that substantial record evidence supports the RFC finding, we necessarily reject [claimant's] vocational expert challenge.").  The converse, of course, is that when an RFC determination is not supported by substantial evidence, a hypothetical based on that RFC is not proper and warrants remand.  *See Aubeuf v. Schweiker*, 649 F.2d 107, 114 (2d. Cir. 1981) ("The hypothetical question . . . incorporated the ALJ's conclusion . . . which we have found to

be based on an erroneous standard, and did not adequately account for [claimant's] actual limitations.  We therefore . . . remand for reconsideration . . . ."); *see also McClinton v. Colvin*, No. 13 Civ. 8904, 2015 WL 6117633, at *33 (S.D.N.Y. Oct. 16, 2015) ("And when a remand is already necessary to properly determine the plaintiff's RFC, the vocational-capacity finding must also be remanded when it was based on the testimony of a VE answering a similarly flawed hypothetical.").  That is the case here.

## Conclusion

For the reasons stated above, pursuant to sentence four of 42 U.S.C. § 405(g), I recommend denying the Commissioner's motion, granting Plaintiff's motion, and remanding this case for further consideration by the Commissioner consistent with this Report and Recommendation.

## Procedures for Filing Objections

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation.  Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Lewis J. Liman, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, 500 Pearl Street, New York, New York 10007.  **FAILURE TO FILE TIMELY OBJECTIONS WILL RESULT IN WAIVER OF OBJECTIONS AND PRECLUDE APPELLATE REVIEW.**

Respectfully submitted,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

48

Dated:  September 14, 2020
        New York, New York

Copies transmitted this date to all counsel of record.